2005 SEP 16   AM 8: 32

U.S. ___ ___CY COURT
NORTH___ ___ST OF MISS

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF MISSISSIPPI

IN RE:

FF ACQUISITION CORP. D/B/A FLEXIBLE-FLYER          **CHAPTER 11**
Debtor                                              **CASE NO. 05-16187**

### DEBTOR'S AMENDED EMERGENCY MOTION FOR ORDER AUTHORIZING DEBTOR TO FACTOR ACCOUNTS RECEIVABLE AND USE CASH COLLATERAL, GRANTING SECURITY INTERESTS AND ADEQUATE PROTECTION, AND FOR OTHER RELIEF

COMES NOW FF Acquisition Corp. d/ba Flexible-Flyer (the "Debtor," or the "Movant") and files this its Amended Emergency Motion for Order Authorizing Debtor to Factor Accounts Receivable and Use Cash Collateral, Granting Security Interests and Adequate Protection, and for Other Relief (the "Amended Motion") **for the sole purpose of replacing the Budget submitted as Exhibit "B" in the original Motion**, and in support thereof, would respectfully show as follows, to-wit:

#### Introduction

1.      On September 9, 2005 (the "Petition Date"), the Movant filed with this Court its Voluntary Petition for relief under Chapter 11 of Title 11, United States Code (the "Bankruptcy Code"). The Debtor remains in possession of its assets and properties as debtor-in-possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code.

2.      To date, no trustee, examiner or official committee has been appointed in this case.

#### Jurisdiction and Venue

3.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (M). Venue is proper in this Court under 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief requested herein are §§ 363 and 364 of the Bankruptcy Code and Bankruptcy Rule 4001(b).

## Background

4.     Prior to the Petition Date, Movant was engaged in the manufacturer, sale, distribution and marketing of metal swing sets, hobby horses, go-carts and compact utility vehicles. The Debtor's pre-petition manufacturing operations were significantly impacted when it could not obtain commitments from its major customer base for purchases of finished goods in the future.

5.     Secured Obligations of the Debtor. As of the Petition Date, the Debtor owed approximately $2,000,000.00 of indebtedness to the CIT Group/Commercial Services, Inc. ("CIT"). CIT served as the Debtor's pre-petition working capital lender, pursuant to a relationship commonly known as "factoring," whereby the Debtor sold the majority of its account receivables to CIT in exchange for cash advances by CIT to the Debtor. CIT has also provided certain letters of credit to the Debtor. CIT asserts a first priority security interest in the Debtor's account receivables, inventory and significant other assets (the "Collateral), in order to secure the Debtor's obligations. The Debtor believes that CIT enjoys a first priority security interest in the Collateral, but it has not completed an analysis with respect to the extent, validity or priority of CIT's alleged security interests and reserves all rights with respect thereto. A copy of CIT's factoring agreement is attached, incorporated by reference and marked as Exhibit "A."

6.     Further, the Debtor may be subject to lien claim assertions with respect to certain other borrowings, but the extent, validity or priority have not been fully investigated or determined by the Debtor, which reserves all rights with respect thereto. For the purposes of the Amended Motion, the Debtor does not believe that any other creditor holds liens or security interests in connection with the remaining assets of the Debtor that are the subject of the Amended Motion, especially with respect to the Debtor's account receivables, inventory and its cash collateral.

-2-

7.    Events leading to bankruptcy filing. The Debtor has suffered cash flow problems for several months due, in part, to its major customers not purchasing finished goods at forecast levels, unjustified returned finished goods and uncertainty as to whether or not its customer base is willing to make commitments for the purchase of the Debtor's finished goods in the future, so as to justify the Debtor in purchasing raw materials for the manufacture of finished goods. Those cash shortages have resulted in the Debtor's inability to pay its operating expenses and it needs the relief afforded by the Bankruptcy Code to orderly liquidate its business operations. The Debtor does not believe that it is viable as an ongoing, operating entity, and it has made the decision to liquidate its account receivables, inventory and other assets pursuant to Chapter 11 of the Bankruptcy Code.

## Relief Requested

8.    The Debtor is in immediate need of the use of cash, which may include the use of cash collateral pursuant to §363 of the Bankruptcy Code, and borrowed funds, pursuant to § 364 of the Bankruptcy Code to continue its operations. This includes the payment of utility bills, ongoing lease operating expenses, payment for goods and services necessary to maintain normal operations, wages and employee-related expenses, and the other normal categories of expenses and expenditures as set forth in a budget (the "Budget"), which is attached, incorporated by reference and marked as Exhibit "B."

9.    The Debtor has been in discussions with representatives of CIT regarding the use of cash collateral and to continue with the factoring agreement with respect to post-petition account receivables.

10.    Rule 4001(b) & (c) of the Bankruptcy Rules provides that a bankruptcy court may conduct hearings on motions under Sections 363 & 364 of the Bankruptcy Code upon a fifteen (15) day notice period as described therein; however, Rule 4001(b)(2) & (c)(2) expressly provides for the conduct of an

-3-

interim hearing before the expiration of such 15 days, at which time the Court may authorize the use of cash

collateral or borrowing to the extent necessary to avoid immediate and irreparable harm to a debtor's estate

pending a final hearing. The Debtor accordingly requests interim authority to use cash collateral and

borrow money pursuant to the Amended Motion to pay necessary costs and expenses.

11.     As noted, the Debtor needs additional funding for its future operations, over and above

certain limited use of cash collateral. The source of this additional funding is CIT. In its limited operations,

the Debtor will also need additional working capital to pay overhead and operating expenses and CIT has

agreed to continue its factoring arrangements with the Debtor so as to provide some of the working capital

that the Debtor will need in its ongoing operations.

12.     CIT, in its sole discretion, may purchase additional post-petition accounts (the "Post-

petition Factoring") from the Debtor on the terms and conditions contained in the Amended Motion and

the Factoring Agreement, the proceeds of which shall be used solely for purposes of operating Debtor's

business. Without the Post-petition Factoring, the value of Debtor's assets will immediately and

substantially diminish, and Debtor will have no reasonable prospect of continuing to orderly liquidate its

assets, preserving the value of its assets or effecting an orderly liquidation, and Debtor would suffer

immediate and irreparable injury. CIT will not consent to the use of cash collateral and the Post-petition

Factoring except upon the terms and conditions set forth herein. In order to continue the operation of

Debtor's businesses and to preserve the value of its assets, the Debtor requires the use of the cash and

the Post-petition Factoring.

13.     Debtor is unable in the ordinary course of business or otherwise, to obtain unsecured credit

allowable pursuant to section 503(b)(1) of the Bankruptcy Code as an administrative expense pursuant to

-4-

sections 363 or 364(a) or (b) of the Bankruptcy Code in an amount necessary for the maintenance and

preservation of its assets and operation of its business, or secured indebtedness pursuant to section 364(c)

of the Bankruptcy Code on terms or from sources other than as provided by CIT pursuant to the terms of

this Amended Motion.

14.    Good cause exists for the entry of an Order granting the Amended Motion. Among other

things, entry of an Order will minimize the disruption of the Debtor's existing business, will increase the

possibility for a successful orderly liquidation of the Debtor, will maintain the value of the Debtor's assets,

and is in the best interests of the Debtor, its creditors and other parties-in-interest.

15.    The terms of the Post-petition Factoring outlined herein are for reasonably equivalent value

and fair consideration.

16.    CIT will make the Post-petition Factoring available if, and only if, Debtor (i) has complied

with the terms of the Amended Motion and (ii) the Factoring Agreement.

Debtor's obligations to CIT under this Amended Motion and the Factoring Agreement,

whether arising pre-petition or post-petition, shall be secured by a valid and perfected security interest in

and lien on the Collateral, including post-petition additions thereto, subject in all respects to the valid and

perfected security interests with lien priority rights that existed with respect to the Collateral on the Petition

Date.

CIT shall be granted an administrative priority claim pursuant to Section 503(b) of the

Bankruptcy Code, arising from Post-petition Factoring.

To the extent not otherwise provided herein, the Debtor hereby grants to CIT a continuing,

additional and replacement lien on and security interest in, to and against all Collateral acquired by Debtor

-5-

post-petition, including, without limitation, all proceeds, product and offspring thereof, wherever located.

The agreements and arrangements outlined herein have been negotiated at arms' length with all parties represented by counsel, are fair and reasonable under the circumstances, are enforceable in accordance with their terms and have been entered into in good faith.

17. The Post-petition Factoring is being extended by CIT in good faith, as contemplated by section 364(e) of the Bankruptcy Code. CIT and the Debtor are acting in good faith with respect to the use of cash collateral, as contemplated by Section 363(m) of the Bankruptcy Code.

18. Consideration of the Amended Motion constitutes a core proceeding as defined in 28 U.S.C. § 157(b)(2)(A), (D), (G), (K), (M) and (0). This Amended Motion is subject to, and CIT is entitled to the benefits of, the provisions of Sections 363(m) and 364(e) of the Bankruptcy Code.

19. Subject to any earlier right of termination herein provided, Debtor's right to request Post-petition Factoring shall terminate at the close of business on the date the Court schedules a final hearing upon the Amended Motion, unless the parties by mutual consent extend this date by filing a stipulation with the Court, which shall be subject to approval without any further notice and hearing, unless the terms of this Amended Motion have been materially changed. Unless extended by CIT, all such Post-petition Factoring shall terminate, without further notice or demand, at the expiration of the term specified herein.

20. Priority of Post-petition Lien. Except as to valid, perfected security interests in the Collateral which are of record as of the date of this Amended Motion and which prime CIT, CIT's security interests in the Collateral, including post-petition additions thereto, shall be senior to all other security interests and shall at all times be senior to the rights of Debtor or its successors-in-interest, including, without limitation, any superseding trustee in this Chapter 11 case or any trustee in a case into which this case may be converted pursuant to another chapter of the Bankruptcy Code. However, the Debtor shall

not grant CIT a lien or security interest that is superior to any liens or security interests that have been

properly perfected and have priority rank.

    21.    <u>Reporting Requirements</u>.

    (a)    Debtor shall promptly provide CIT and its counsel with copies of all reports made

to the Court, all reports or financial data prepared by Debtor's auditors, and all reports and information

currently required to be provided by the Debtor to CIT, including, without limitation, the reports and

information required by the Factoring Agreement, and all such other information as may be reasonably

requested by CIT.

    (b)    Debtor shall permit representatives of CIT reasonable access to the books and

records of Debtor, all reports or financial data given by Debtor to any other third party, and shall permit

reasonable opportunity to meet with and obtain information from responsible personnel of Debtor.

Specifically, without limitation, Debtor shall permit CIT, its agents, or any accounting firm selected by CIT,

reasonable access to Debtor's books and records and business premises for the purpose of conducting

any audit or other study deemed necessary or appropriate by CIT or by CIT's accountants.

    22.    <u>Execution of Documents and Automatic Perfection of Liens</u>. To evidence the obligations,

the creation of security interests as set forth above, and all terms and provisions evidencing the agreements

between Debtor and CIT, the Debtor respectfully requests that it be authorized to execute and deliver to

CIT, at CIT's option, any and all of the following as may be requested or required by CIT, in form and

substance acceptable to CIT:

    All agreements, instruments and documents of any type or nature, including, without

limitation, factoring agreements, security agreements, financing statements, notes, schedules, instruments,

powers of attorney, consents, assignments, contracts, notices, leases, amendments, supplements and

allonges implementing the Security Agreement and security interests and liens granted in connection

therewith, and all other written matter now or from time to time hereafter reasonably requested by CIT.

Notwithstanding the foregoing, all agreements, sales of accounts, security interests, and liens

contemplated by this Amended Motion are effective and perfected without further filing by CIT in

compliance with any state or federal law. CIT will not be required to file financing statements or other

documents in any jurisdiction or take any other actions in order to perfect its purchase of accounts, security

interests and liens made or granted under or pursuant to the Amended Motion. If CIT, in its sole discretion,

chooses to file any financing statements, or other documents to otherwise confirm perfection of such

security interests and liens, all such documents shall be deemed to have been filed or recorded at the time

and on the Petition Date. However, the failure of Debtor to execute any such documentation, or failure of

CIT otherwise to attach or perfect its security interest in the Collateral under state or federal law, shall in

no way affect the validity, perfection, or priority of the security interests, and liens granted to CIT.

## Law and Argument

**A.**   **Cash Collateral Can Be Used by a Debtor-in-Possession Only with the Consent of the Lender or an Order of the Court Determining that the Lender will be Adequately Protected.**

23.     A debtor's use of property of the estate is governed by Bankruptcy Code Section

363. Section 363(c)(1) provides that a debtor in possession may use property of the estate in the ordinary

course of business without notice or a hearing. 11 U.S.C. § 363(c)(1), Section 363(c)(2), however,

permits a debtor in possession to use, sell or lease "cash collateral" under subsection (c)(1) only if the entity

with an interest in the cash collateral consents or the Court authorizes such use. 11 U.S.C. § 363(c)(2).

Whether such use may be authorized by a court depends on whether there is adequate protection of the

entity's interest in the cash collateral. Section 361 of the Bankruptcy Code does not provide a definition

-8-

of adequate protection. However, it is clear that under case law considering adequate protection in similar

circumstances, CIT is adequately protected in this case.

24.     As noted, the Debtor believes CIT holds an interest in certain cash of the Debtor in the

nature of a cash collateral interest.

### 1.     CIT is Adequately Protected by the Projected Maintenance of Inventory and Account Receivables Levels.

25.     The Bankruptcy Code protects a secured creditor only to the extent that a debtor's use

of the collateral will result in a decrease in "the value of such entity's interest in such property." 11 U.S.C.

§§ 361, 363(e); *see United Savs. Ass 'n v. Timbers of Inwood Forest Ass'n Ltd.,* 484 U.S. 365, 369-

73, 108 S. Ct. 626 (1988) ("Timbers") (Supreme Court holds that the "interest in property" entitled to

protection is "the value of the collateral, as of the time of the commencement of the bankruptcy case" that

secures such claim). *See also Orix Credit Alliance, Inc. v. Delta Resources, Inc. (In re Delta*

*Resources,* Inc.) 54 F.3d 722, 730 (11th' Cir.). *cert. denied* 116 S. Ct. 488 (1995). Here, the interests

of CIT are adequately protected by the Debtor's agreement to grant CIT a continuing security interest and

replacement lien in post-petition inventory, account receivables, cash and related collateral.  The

replacement liens will protect against any diminution of those interests as a result of the Debtor's use of cash

collateral so that sufficient adequate protection exists to permit the use of cash collateral contemplated by

the Debtor.  CIT holds account receivables of $3,600,000.00, while its debt is $1,900,000.00.

26.     In addition, CIT is adequately protected by the Debtor's ongoing orderly liquidation, which

will preserve the value of the allegedly securing the claims of CIT.  If the value of CIT's collateral is

expected to remain relatively constant, CIT is deemed to be adequately protected without any other form

of adequate protection, *See e.g., Orix Credit Alliance, supra: Westchase I Assoc. L.P. v. Lincoln Nat'l Life Ins. Co.,* 126 B.R. 692, 694 (W.D.N.C. 1991). *See e.g., In re Dynaco Corp.,* 162 B.R. 389 (Bankr. D.N.H. 1993); *McCombs Properties VI. Ltd. v. First Texas Sav. Ass 'n (In re McCombs Properties VI. Ltd. ),* 88 B.R. 261, 267 (Bankr. C.D. Cal. 1988), especially where the Debtor will not be using cash collateral to purchase additional inventory or to pay operating costs other than those absolutely necessary to convert its finished product to account receivables and then to cash.

**C.      Authorizing the Use of Cash Collateral is Necessary to Preserve Value Which Will Inure to the Benefit of CIT and All Other Parties-in-Interest.**

27.      The continuing (but limited) operation of the Debtor's business will help to preserve the value of the existing finished goods. The Debtor should have a reasonable opportunity to ship its finished goods, thereby creating valuable account receivables and, ultimately, cash. Generally, courts have focused on the use of cash collateral, or borrowing, in a reorganization context. It is well established that a bankruptcy court, where possible, should resolve issues in favor of reorganization:

> Because the ultimate benefit to be achieved by a successful reorganization inures to all the creditors of the estate, a fair opportunity must be given to the Debtors to achieve that end. Thus, while interests of the secured creditor . . . are of concern to the court, the interests of all other creditors also have bearing upon the question of whether use of cash collateral shall be permitted during the early stages of administration.

> The first effort of the court must be to insure the value of the collateral will be preserved. Yet, prior to confirmation of a plan of reorganization, the test of that protection is not by the same measurements applied to the treatment of a secured creditor in a proposed plan. In order to encourage the Debtor's efforts in the formative period prior to the proposal of a reorganization, the court must be flexible in applying the adequate protection standard.

*MBank Dallas, N.A. v. O'Connor (In re O'Connor),* 808 F.2d 1393, 1397-98 (10th Cir. 1987)*: accord Dynaco* Corp., 162 B.R. at 395 (Bankr. D.N.H. 1983) (cash collateral motion): *Hoffman v. Portland*

*Bank (In re Hoffman),* 51 B.R. 42, 47 (Bankr. W.D. Ark. 1985) (relief from stay); *In re Heatron, Inc.,*

6 B.R. 493, 496 (Bankr. W.D. Mo. 1980) (cash collateral motion).

28.     Indeed, as the court in *Chrysler Credit Corp. v. Ruggiere (In re George Ruggiere*

*Chrysler-Plymouth, Inc.),* 727 F.2d 1017 (11th Cir. 1984*),* noted:

> A debtor, attempting to reorganize a business under Chapter 11, clearly has a compelling
> need to use "cash collateral" in its effort to rebuild. Without the availability of cash to meet
> daily operating expenses such as rent, payroll, utilities, etc., the congressional policy
> favoring rehabilitation over economic failure would be frustrated.

*Id.* at 1019.

29.     Applying the foregoing, courts have often allowed the use of cash collateral where

such use would enhance or preserve the debtor's reorganization value. Thus, for example, in *Stein v.*

*United States Farmers Home Administration (In re Stein),* 19 B.R. 458 (Bankr. E.D. Pa. 1982), the

court allowed a debtor to use cash collateral where the secured party was unsecured, finding that the use

of cash collateral was necessary to the continued operations of the debtor and the creditor's "secured

position can only be enhanced by the continued operation of the [debtor's business]". *Id.* At 19 B.R. 460;

*see also Dynaco,* 162 B.R. at 396 (finding that the alternative to the debtor's use of cash collateral, a

forced termination of its business, would doom reorganization and any chance to maximize value for all

creditors): *In re Karl A. Neise, Inc.,* 16 B.R. 600, 602 (Bankr. S.D. Fla. 1981) (marginally secured

creditor adequately protected by lien on post-petition property acquired by debtor; the debtor can use cash

collateral "in the normal operation of their business").

30.     Although this case is a liquidating case under Chapter 11, the above principles and

authorities support the Debtor's use of cash collateral in this instance, in that the Debtor's use of cash

collateral will preserve and maintain the value of its finished goods/account receivables/cash, thereby
enhancing those assets as opposed to a forced liquidation.

31.     If the Debtor is denied the use of cash collateral, or borrowing, in all likelihood it will be
forced to cease all operations. Such a cessation of operations, even temporarily, would cause the Debtor
significant losses with respect to the value of its finished goods. It would also likely result in a forced
liquidation of all of the Debtor's assets, and a consequent loss to creditors of value. The Budget represents
those payments that are critical needs of the Debtor and the Debtor seeks permission of the Court to pay
those critical need claims and creditors immediately from cash collateral. The Debtor believes that CIT will
agree to the use of cash collateral for these purposes.

**D.     The Debtor is Prepared to Grant CIT Liens on Certain Post-petition Assets to the Extent
CIT is Secured and the Debtor's Use of Cash Collateral Decreases the Value of Such
Liens.**

32.     The Bankruptcy Code expressly provides that granting of a replacement lien
constitutes a means of adequate protection. 11 U.S.C. § 361(2). The granting of replacement liens
provides ample adequate protection of CIT's interest in cash collateral. *See, e.g., MBank Dallas, N.A.
v. O'Connor (In re O'Connor),* 808 F.2d 1393 (10th Cir. 1987); *In re Dixie-Shamrock Oil & Gas, Inc.,*
39 B.R. 115, 118 (Bankr. M.D. Tenn. 1984).

33.     The Debtor is prepared to provide adequate protection to CIT in the nature of replacement
liens as set forth herein. Specifically, CIT shall be granted a replacement lien, but solely to the extent of
its actual interest in cash collateral and any diminution in its secured position as a result of the Debtor's use
of cash collateral, upon (i) all assets in which a validly perfected lien existed at the Petition Date, (ii) all
property acquired by the Debtor after the Petition Date that is of the exact nature, kind or character of pre-
petition collateral, and (iii) all cash and account receivables attributable to CIT's pre-petition collateral.

-12-

In addition, CIT will continue to receive payments from the Debtor's customers with respect to the pre-petition receivables which have been "factored" to, and purchased by, CIT, providing significant cash payments toward reduction of CIT's claims.

34.    In addition, the Debtor will provide CIT with information relating to projected revenue and expenses, actual revenue and expenses and variances. This information will enable CIT to monitor its interests in collateral. Such reporting of financial information has been held to be a form of adequate protection. *See, e.g., Mutual Benefit Life Ins. Co. v. Stanley Station Assocs., L.P. (In re Stanley Station Assocs., L.P.)*, 140 B.R. 806, 809 (D. Kan. 1992) ("In addition, we believe the request by MBL for 'timely filing of proper monthly operating reports . . .' falls within the ambit of adequate protection . . ."); *Sumitomo Trust & Banking Co. v. Holly's. Inc. (In re Holly's, Inc.)*, 140 B.R. 643, 706 (Bankr. W.D. Mich. 1992) (reports required as part of adequate protection).

**E.**    **The Debtor Should Be Authorized to Use Cash Collateral to Operate and Maintain Its Business Based Upon the Equities of the Cases.**

35.    Pursuant to Bankruptcy Code Section 552(b)(2), a lender's security interest does not extend to post-petition property if the Court so orders "based on the equities of the case." 11 U.S.C. § 552(b)(2). In determining the "equities of the case," the Court has "broad discretion to balance the protection of secured creditors, on the one hand, against the strong public policies favoring continuation of jobs, preservation of going concern values and rehabilitation of distressed debtor, generally," H.R. 5116, 103rd Cong., 2nd Sess., 140 Cong. Rec. H10768 (1994). This is particularly true in the Debtor's chapter 11 case which involves the preservation of its assets as much as possible. In the present case, therefore, the equities overwhelmingly mandate that the Debtor be permitted to use cash collateral.

**Notice**

36.     Notice of this Amended Motion has been provided to (i) the known relevant secured

parties (CIT) and its counsel and the U. S. Trustee by hand delivery and/or telecopy. The Debtor submits

that notice is appropriate and proper under the circumstances and that no further notice is required.

37.     An emergency hearing on this Amended Motion is necessary and essential for the continued

operations of the Debtor. The Court should permit this Amended Motion to go forward on an expedited

basis and shorten notice of such hearing under the Federal Rules of Bankruptcy Procedure. The Debtor

submits that such notice would be appropriate and proper under the circumstances and that no further

notice would be required.

38.     No previous request for the relief sought herein has been made to this or any other court.

**Conclusion**

39.     The Debtor respectfully requests that this Court, upon consideration of the Amended

Motion, (1) authorize the Debtor's use of cash collateral and borrowing on an interim basis in accordance

with the Budget provided for herein; (2) schedule a final hearing on this Amended Motion; (3) upon final

consideration, authorize the Debtor's use of cash collateral and borrowing in accordance with the Budget,

and (4) grant the Debtor such other and further relief to which it may be entitled.

Respectfully submitted this /6    day of September, 2005.

FF ACQUISITION CORP.
D/B/A FLEXIBLE-FLYER

By Its Attorneys,
HARRIS & GENO, PLLC

By: _____
Craig M. Geno

-14-

OF COUNSEL:

Craig M. Geno; MSB No. 4793
Jeffrey K. Tyree; MSB No. 9049
Melanie T. Vardaman; MSB No. 100392
Harris & Geno, PLLC
587 Highland Colony Parkway (39157)
P. O. Box 3380
Ridgeland, MS 39158-3380
601-427-0048 - Telephone
601-427-0050 - Facsimile
F:\Users\Bankrupt\Flexible-Flyer\Pleadings\Flexible Flyer\Factoring, Cash Collateral Use\Motion.Amended.wpd


## CERTIFICATE OF SERVICE

I, Craig M. Geno, do hereby certify that I have caused to be served this date, via U. S. Mail, postage prepaid, a true and correct copy of the above and foregoing to the following:

Sammye S. Tharp, Esq.
Office of the United States Trustee
Suite 706, A. H. McCoy Federal Building
100 West Capitol Street
Jackson, MS  39269

THIS, the _16th_ day of September, 2005.

Craig M. Geno

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI**

**IN RE:**
**FF ACQUISITION CORP. D/B/A FLEXIBLE-FLYER**　　　**CHAPTER 11**
**Debtor**　　　　　　　　　　　　　　　　　　　　　**CASE NO. 05-16187**

# EXHIBIT "A"

CIT Commercial Services
1211 Avenue of the Americas
New York, NY 10036



January 4, ~~2000~~ 2001 CG (Int)

**FF Acquisition Corp.**
100 Tubb Avenue
West Point, Mississippi 39773

## FACTORING AGREEMENT

Ladies and Gentlemen:

We are pleased to confirm the terms and conditions that will govern our funds in use accounting, notification factoring arrangement with advances (the "Agreement").

### 1. SALE OF ACCOUNTS

You sell and assign to us, and we purchase as absolute owner, all accounts receivable arising from your sales of inventory or rendition of services, including those under any trade names, through any divisions and through any selling agent (collectively, the "Accounts" and individually, an "Account").

### 2. CREDIT APPROVAL

2.1 Requests for credit approval for all of your orders must be submitted to our Credit Department via computer by either: (a) On-Line Terminal Access, or (b) Electronic Batch Transmission. If you are unable to submit orders via computer, then orders can be submitted over the phone, by fax or in writing. All credit decisions by our Credit Department (including approvals, declines and holds) will be sent to you daily by a Credit Decisions Report, which constitutes the official record of our credit decisions. Credit approvals will be effective only if shipment is made or services are rendered within thirty (30) days from the completion date specified in our credit approval. Credit approval of any Account may be withdrawn by us any time before delivery is made or services are rendered.

2.2 We assume the Credit Risk on each Account approved in the Credit Decision Report. "Credit Risk" means the customer's failure to pay the Account in full when due on its longest maturity solely because of its financial inability to pay. If there is any change in the

Not. FIU Adv. ©
5/22/98

4.2  You further represent and warrant that: you are a duly organized and validly existing business organization qualified to do business in all states where required to ensure collectibility of Accounts; the most recent financial statements provided by you to us accurately reflect your financial condition as of that date and there has been no material adverse change in your financial condition since the date of those financial statements.  You agree to furnish us with such information concerning your business affairs and financial condition as we may reasonably request from time to time.  You will furnish to us (a) as soon as possible, but not later than one hundred twenty (120) days after the end of each of your fiscal years an audited financial statement as at the close of such year, and statements of profit and loss, cash flow and reconciliation of surplus for such year, audited by a firm of independent certified public accountants selected by you and reasonably satisfactory to us; and (b) as soon as possible, but not later than sixty (60) days after the end of each of your fiscal half years your financial statement as at the end of such period, and statements of profit and loss, cash flow and surplus for such fiscal half year, reviewed and certified by your chief financial officer.

4.3  You agree that you will promptly notify us of any change in your:  name, location of your chief executive office, place(s) of business, use of trade names and divisions, and legal or business structure.  Further, you agree that you will promptly notify us of any change in control of ten percent (10%) or more of the ownership interests of your business organization, and of significant law suits or proceedings against you.

## 5.  PURCHASE OF ACCOUNTS

We shall purchase the Accounts for the gross amount of the respective invoices, less:  factoring fees or charges, trade and cash discounts allowable to, or taken by, your customers, credits, cash on account and allowances ("Purchase Price").  Our purchase of the Accounts will be reflected on the Statement of Account (defined in section 10 below), which we shall render to you, which will also reflect all credits and discounts made available to your customers.

## 6.  ADVANCES

At your request, and in our sole discretion, we may advance funds to you of up to eighty percent (80%) of your Factor Risk Accounts, prior to the collection of the Accounts.  We have the right, at any time and from time to time, to hold any reserves we deem reasonably necessary as security for the payment and performance of any and all of your Obligations (defined in section 12 below).  All amounts you owe us, including all advances to you and any debit balance in your Client Position Account (defined in section 10 below), and any Obligations, are payable on demand and may be charged to your account at any time.

## 7.  PAYMENT OF ACCOUNTS

7.1  All payments received by us on the Accounts will be promptly applied to your account with us ("Funds In Use Account") after crediting your customer's account.  In exchange for such application, we shall charge your account monthly with the cost of two (2) additional

business days on all such payments at the rate charged by us in section 14.1 below on debit balances. No checks, drafts or other instruments received by us will constitute final payment of an Account unless and until such items have actually been collected.

7.2 The amount of the Purchase Price of any Factor Risk Account which remains unpaid will be deemed collected and will be credited to your account as of the earlier of the following dates:

(a)     the date of the Account's longest maturity if a proceeding or petition is filed by or against the customer under any state or federal bankruptcy or insolvency law, or if a receiver or trustee is appointed for the customer; or

(b)     the last day of the third month following the Account's longest maturity date if such Account remains unpaid as of said date without the occurrence of any of the events specified in clause (a) above.

If any Factor Risk Account credited to you was not paid for any reason other than Credit Risk, we shall reverse the credit and charge your account accordingly, and such Account is then deemed to be a Client Risk Account.

## 8. CUSTOMER CLAIMS AND CHARGE BACKS

8.1 You must notify us promptly of any matter affecting the value, enforceability or collectibility of any Account and of all Customer Claims. You agree to promptly issue credit memoranda or otherwise adjust the customer's account upon accepting returns or granting allowances. For full invoice credit memoranda, you agree to send duplicate copies thereof to us and to confirm their assignment to us. You may continue to do so until we have advised you that all such credits or allowances on Factor Risk Accounts require our prior written approval. Once you have granted or issued a discount, credit or allowance on any Account, you have no further interest therein. We shall cooperate with you in the adjustment of Customer Claims, but we retain the right to adjust Customer Claims on Factor Risk Accounts directly with customers, upon such terms as we in our sole discretion may deem advisable.

8.2 We may charge back to your account the amount of: (a) any Factor Risk Account which is not paid in full when due for any reason other than Credit Risk; (b) any Factor Risk Account which is not paid in full when due because of an act of God, civil strife, or war; (c) anticipation (interest) deducted by a customer on any Account; (d) Customer Claims; (e) any Client Risk Account which is not paid in full when due; and (f) any Account for which there is a breach of any representation or warranty. A charge back does not constitute a reassignment of an Account. We shall immediately charge any deduction taken by a customer to your account.

8.3 We may at any time charge to your account the amount of: (a) payments we receive on Client Risk Accounts which we are required at any time to turnover or return (including preference claims); (b) all remittance expenses (including incoming wire charges,

currency conversion fees and stop payment fees), other than stop payment fees on Factor Risk Accounts; (c) expenses, collection agency fees and reasonable attorneys' fees incurred by us in collecting or attempting to collect any Client Risk Account or any Obligation (defined in section 12 below); and (d) our fees for handling collections on Client Risk Accounts which you have requested us to process, as provided in the Guide (see section 18.2 below).

## 9.  HANDLING AND COLLECTING ACCOUNTS; RETURNED GOODS

9.1  As owners of the Factor Risk Accounts, we have the right to: (a) bring suit, or otherwise enforce collection, in your name or ours; (b) modify the terms of payment, (c) settle, compromise or release, in whole or in part, any amounts owing, and (d) issue credits in your name or ours.  To the extent applicable, you waive any and all claims and defenses based on suretyship. If moneys are due and owing from a customer for both Factor Risk Accounts and Client Risk Accounts, you agree that any payments or recoveries received on such Accounts will be applied using our normal procedures. If at the time of a customer liquidation, we each have Accounts at our respective risk, we agree that all payments, dividends, recoveries or proceeds will be shared pro rata in proportion to our respective Credit Risk for that customer. Any checks, cash, notes or other documents or instruments, proceeds or property received with respect to the Accounts must be held by you in trust for us, separate from your own property, and immediately turned over to us with proper endorsements.  We may endorse your name or ours on any such check, draft, instrument or document.

9.2  As owners and assignees of the Accounts and all proceeds thereof, upon our written notice, you will, at your expense, set aside, mark with our name and hold in trust for us, any and all returned, rejected, reclaimed or repossessed inventory ("Returned Goods").  Further, upon such notice, you agree promptly:  to notify us of all Returned Goods and, at our request, either to deliver same to us, or to pay us the invoice price thereof, or to sell the same for our account.

## 10.  STATEMENT OF ACCOUNT

After the end of each month, we shall send you certain reports reflecting Accounts purchased, advances made, fees and charges and all other financial transactions between us during that month ("Reports").  The Reports sent to you each month include a Statement of Account reflecting transactions in three sections:  Accounts Receivable, Client Position Account and  Funds In Use.  The Reports shall be deemed correct and binding upon you and shall constitute an account stated between us unless we receive your written statement of exceptions within thirty (30) days after same are mailed to you.

## 11.  GRANT OF SECURITY INTEREST

11.1  You hereby assign and grant to us a continuing security interest in all of your right, title and interest in and to all of your now existing and future: (a) accounts receivable (including Accounts), instruments, documents, chattel paper, general intangibles (in connection

with rights to payment arising from your sales of inventory or performances of services), and any other obligations owing to you arising from your sales of inventory or performance of services; (b) unpaid seller's rights (including rescission, repossession, replevin, reclamation and stoppage in transit); (c) rights to any inventory represented by the foregoing, including Returned Goods; (d) reserves and credit balances arising hereunder; (e) guaranties or collateral for the foregoing (including rights under any letters of credit or other credit enhancements in your favor); (f) insurance policies, proceeds or rights relating to the foregoing; (g) cash and noncash proceeds of the foregoing; and (h) Books and Records (defined in section 13 below) evidencing or pertaining to the foregoing. You hereby also irrevocably grant to us a royalty-free, nonexclusive license in your general intangibles including your trade names, trademarks, copyrights, patents, licenses and any other proprietary and intellectual property rights and any and all right, title and interest in any of the foregoing, for the sole purpose of our effecting our rights to advertise for sale and sell or transfer any inventory represented by clauses (a) and/or (b) of the preceding sentence, including Returned Goods, bearing or affected by any of your general intangibles.

11.2    You agree to comply with all applicable laws to perfect our security interest in collateral pledged to us hereunder, and to execute financing statements and other documents as we may require to effectuate the foregoing and to implement this Agreement. To the extent permitted by applicable law, you authorize us to sign your name, or to file financing statements or continuations without your signature, all in order to create, perfect or maintain our security interest in the collateral.

## 12. OBLIGATIONS SECURED

The security interest granted hereunder and any lien or security interest that we now or hereafter have in any of your other assets, collateral or property, secure the payment and performance of all of your now existing and future indebtedness and obligations to us, whether absolute or contingent, whether arising under this Agreement or any other agreement or arrangement between us, by operation of law or otherwise ("Obligations"). Obligations also includes ledger debt (which means indebtedness for goods and services purchased by you from any party whose accounts receivable are factored or financed by us), and indebtedness arising under any guaranty, credit enhancement or other credit support granted by you in our favor. Any reserves or balances to your credit and any other assets, collateral or property of yours in our possession constitutes security for any and all Obligations.

## 13. BOOKS AND RECORDS AND EXAMINATIONS

13.1    You agree to maintain such Books and Records concerning the Accounts as we may reasonably request and to reflect our ownership of the Accounts therein. "Books and Records" means your accounting and financial records (whether paper, computer or electronic), data, tapes, discs, or other media, and all programs, files, records and procedure manuals relating thereto, wherever located.

13.2   Upon our reasonable request, you agree to make your Books and Records available to us for examination and to permit us to make copies or extracts thereof. Also, you agree to permit us to visit your premises during your business hours and to conduct such examinations as we deem reasonably necessary. To cover our costs and expenses of any such examinations, we shall charge you a fee of Seven Hundred Fifty Dollars ($750.00) per examiner for each day, or part thereof, during which such examination is conducted, plus any out-of-pocket costs and expenses incurred by us, as provided in the Guide (see section 18.2 below).

## 14. INTEREST

14.1   Interest is charged as of the last day of each month based on the daily debit balances in your Funds In Use account for that month, at a rate equal to the greater of: (a) the sum of three-quarters of one percent (0.75%) plus the Chase Prime Rate (defined below), or (b) six percent (6%) per annum. The Chase Prime Rate is the per annum rate of interest publicly announced by The Chase Manhattan Bank (or its successor) in New York, New York from time to time as its prime rate, and is not intended to be the lowest rate of interest charged by The Chase Manhattan Bank to its borrowers. Any change in the rate of interest hereunder due to a change in the Chase Prime Rate will take effect as of the first of the month following such change in the Chase Prime Rate. Interest will be credited as of the last day of each month based on the daily credit balances in your Funds In Use account for that month, at a rate four percent (4%) per annum below the Chase Prime Rate being used to calculate interest for the period. All interest is calculated on a 360 day year.

14.2   In no event will interest charged hereunder exceed the highest lawful rate. In the event, however, that we do receive interest in excess of the highest lawful rate, you agree that your sole remedy would be to seek repayment of such excess, and you irrevocably waive any and all other rights and remedies which may be available to you under law or in equity.

## 15. FACTORING FEES AND OTHER CHARGES

15.1   For our services hereunder, you will pay us a factoring fee or charge of thirty-five hundredths percent (0.35%) of the gross face amount of all Accounts factored with us, but in no event less than $3.00 per invoice. In addition, you will pay a fee of one-quarter of one percent (0.25%) of the gross face amount of each Account for each thirty (30) day period or part thereof by which the longest terms of sale applicable to such Account exceed sixty (60) days (whether as originally stated or as a result of a change of terms requested by you or the customer). For Accounts arising from sales to customers located outside the fifty states of the United States of America, you will pay us an additional factoring fee of one percent (1%) of the gross face amount of all such Accounts. All factoring fees or charges are due and charged to your account upon our purchase of the underlying Account. If the actual factoring fees or charges paid to us by you and FF Acquisition Wheel Goods Corp. pursuant to its separate Factoring Agreement with us dated as of the date hereof ("Wheel Goods"), in total during any twelve (12) month period or part thereof, commencing on January 1, 2001 and each consecutive twelve (12) month period or part thereof thereafter (each a "Period"), is less than

One Hundred Fifty Thousand Dollars ($150,000.00) (the "Minimum Factoring Fees"), we shall charge either your account or the account of Wheel Goods at our discretion as of the end of such Period with an amount equal to the difference between the actual factoring fees or charges paid during such Period and said Minimum Factoring Fees.

15.2 You agree to pay all costs and expenses incurred by us in connection with the preparation, execution, administration and enforcement of this Agreement, including all reasonable fees and expenses attributable to the services of our attorneys (whether in-house or outside), search fees and public record filing fees. Furthermore, you agree to pay to us our fees (as more fully set forth in the Guide, see section 18.2 below) including fees for: (a) special reports prepared by us at your request; (b) wire transfers; (c) handling change of terms requests relating to Accounts; and (d) your usage of our on-line computer services. Beginning on the first of the month six (6) months from the date hereof, you also agree to pay us our fees for; (i) each new customer set-up on our customer accounts receivable data base and each new customer relationship established for you; (ii) crediting your account with proceeds of non-factored invoices received by us; and (iii) charge backs of invoices factored with us that were paid directly to you. All such fees will be charged to your account when incurred. Our fees may be changed by us from time to time upon notice to you; however, any failure to give you such notice does not constitute a breach of this Agreement and does not impair our ability to institute any such change.

15.3 Any tax or fee of any governmental authority imposed on or arising from any transactions between us, any sales made by you, or any inventory relating to such sales is your sole responsibility (other than income and franchise taxes imposed on us which are not related to any specific transaction between us). If we are required to withhold or pay any such tax or fee, or any interest or penalties thereon, you hereby indemnify and hold us harmless therefor and we shall charge your account with the full amount thereof.

15.4 In addition to the fees and charges which may be payable by you to us under this Agreement, you will also pay to us, as of the date hereof, a documentation fee in the amount of One Thousand Five Hundred Dollars ($1,500.00) to compensate us for use of our in-house legal department and facilities in documenting this Agreement and all such other documents prepared by us in connection with this Agreement.

15.5 In addition to the fees and charges under this Agreement, you will pay us, as of the date hereof, a facility fee in the amount of Fifty Thousand Dollars ($50,000.00) for the initial setup and implementation of your account with us.

15.6 If during the next six (6) months from the date hereof, you have not begun to process all invoices with us by means of Electronic Batch Transmission, then we will charge you a factoring fee of forty-five hundredths percent (0.45%) instead of the fee provided in section 15.1, until such time as your invoices are processed by means of Electronic Batch Transmission.

## 16. TERMINATION

16.1  You may terminate this Agreement only as of an Anniversary Date and then only by giving us at least sixty (60) days prior written notice of termination.  "Anniversary Date" means the last day of the month occurring one (1) year from the date hereof, and the same month and date in each year thereafter.  In the event that this Agreement is terminated by you prior to an Anniversary Date, we shall be entitled to the unpaid portion of the Minimum Factoring Fees, if any, for such Period, as provided in section 15.1 above, as of the effective date of termination.  Except as otherwise provided, we may terminate this Agreement at any time by giving you at least sixty (60) days prior written notice of termination.  However, we may terminate this Agreement immediately, without prior notice to you, upon the occurrence of an Event of Default (defined in section 17.1 below).

16.2  This Agreement remains effective between us until terminated as herein provided.  Unless sooner demanded, all Obligations will become immediately due and payable upon any termination of this Agreement.

16.3  All of our rights, liens and security interests hereunder continue and remain in full force and effect after any termination of this Agreement and pending a final accounting, we may withhold any balances in your account unless we are supplied with an indemnity reasonably satisfactory to us to cover all Obligations.  You agree to continue to assign accounts receivable to us and to remit to us all collections on accounts receivable, until all Obligations have been paid in full or we have been supplied with an indemnity satisfactory to us to cover all Obligations.

## 17. EVENTS OF DEFAULT AND REMEDIES UPON DEFAULT

17.1  It is an "Event of Default" under this Agreement if: (a) your business ceases or a meeting of your creditors is called; (b) any bankruptcy, insolvency, arrangement, reorganization, receivership or similar proceeding is commenced by or against you under any federal or state law; (c) you breach any representation, warranty or covenant contained in this Agreement and any such breach, if curable, shall not have been cured within five (5) days of its occurrence; or (d) you fail to pay any Obligation when due.

17.2  After the occurrence and during the continuance of an Event of Default which is not waived by us, we may terminate this Agreement without notice to you.  We shall then have immediate access to, and may remove from any premises where same may be located, any and all Books and Records as may pertain to the Accounts, Returned Goods and any other collateral hereunder.  Furthermore, as may be necessary to administer and enforce our rights in the Accounts, Returned Goods and any other collateral hereunder, or to facilitate the collection or realization thereof, we have your permission to: (a) use (at your expense) your personnel, supplies, equipment, computers and space, at your place of business or elsewhere; and (b) notify postal authorities to change the address for delivery of your mail to such address as we

may designate and to receive and open your mail.  We agree to turn over to you or your representative all mail not related to the aforesaid purposes.

17.3   After the occurrence and during the continuance of an Event of Default which is not waived by us, with respect to any other property or collateral in which we have a security interest, we shall have all of the rights and remedies of a secured party under Article 9 of the Uniform Commercial Code.  If notice of intended disposition of any such property or collateral is required by law, it is agreed that five (5) days notice constitutes reasonable notice.  The net cash proceeds resulting from the exercise of any of the foregoing rights, after deducting all charges, costs and expenses (including reasonable attorneys' fees) will be applied by us to the payment or satisfaction of the Obligations, whether due or to become due, in such order as we may elect.  You remain liable to us for any deficiencies.  With respect to Factor Risk Accounts and Returned Goods relating thereto, you hereby confirm that we are the owners thereof, and that our rights of ownership permit us to deal with this property as owner and you confirm that you have no interest therein.

## 18. MISCELLANEOUS PROVISIONS

18.1  This Agreement, and all attendant documentation, as the same may be amended from time to time, constitutes the entire agreement between us with regard to the subject matter hereof, and supersedes any prior agreements or understandings.  This Agreement can be changed only by a writing signed by both of us.  Our failure or delay in exercising any right hereunder will not constitute a waiver thereof or bar us from exercising any of our rights at any time. The validity, interpretation and enforcement of this Agreement is governed by the laws of the State of New York, excluding the conflict laws of such State.

18.2  The Client Service Guide, as supplemented and amended from time to time (the "Guide") has been furnished to you or is being furnished to you concurrently with the signing of this Agreement, and by your signature below you acknowledge receipt thereof.  The Guide provides information on credit approval processes, accounting procedures and fees.  The procedures for Electronic Batch Transmission are covered in supplemental instructions to the Guide.  From time to time, we may provide you with amendments, additions, modifications, revisions or supplements to the Guide, which will be operative for transactions between us. All information and exhibits contained in the Guide, on any screen accessed by you, and on any print-outs, reports, statements or notices received by you are, and will be, our exclusive property and are not to be disclosed to, or used by, anyone other than you, your employees or your professional advisors, in whole or in part, unless we have consented in writing.

18.3  This Agreement binds and benefits each of us and our respective successors and assigns, provided, however, that you may not assign this Agreement or your rights hereunder without our prior written consent.

18.4 Section headings are for convenience only and are not controlling.  The use of "including" means "including without limitation".

18.5  If any provision of this Agreement is contrary to, prohibited by, or deemed invalid under applicable laws or regulations, such provision will be inapplicable and deemed omitted to such extent, but the remainder will not be invalidated thereby and will be given effect so far as possible.

## 19.  JURY TRIAL WAIVER

**To the extent permitted by applicable law, we each hereby waive any right to a trial by jury in any action or proceeding arising directly or indirectly out of this Agreement, or any other agreement or transaction between us or to which we are parties.**

If the foregoing is in accordance with your understanding, please so indicate by signing and returning to us the original and one copy of this Agreement.  This Agreement will take effect as of the date set forth above but only after being accepted below by one of our officers in New York, after which we shall forward a fully executed copy to you for your files.

Very truly yours,

THE CIT GROUP/COMMERCIAL SERVICES, INC.

By _____
Name:  CRAIG GOLDSTEIN
Title:  Vice President

Read and Agreed to:

FF ACQUISITION CORP.

By _____
Name:  ALEX J. GARCIA, JR.
Title:  CEO

Accepted at New York, New York

THE CIT GROUP/COMMERCIAL SERVICES, INC.

By _____  VP
Name:  NICHOLAS A FERETTI
Title:  V.P.

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI**

IN RE:
**FF ACQUISITION CORP. D/B/A FLEXIBLE-FLYER**      **CHAPTER 11**
**Debtor**                                         **CASE NO. 05-16187**

# EXHIBIT "B"