**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF MISSISSIPPI**

FLEXIBLE FLYER LIQUIDATING TRUST
F/K/A FF ACQUISITION CORP., d/b/a
FLEXIBLE-FLYER                                                      CAUSE NO. 05-16187

**FLEXIBLE FLYER'S RESPONSE IN OPPOSITION TO**
**VIALINK'S MOTION FOR SUMMARY JUDGMENT**

Flexible Flyer Liquidating Trust f/k/a FF Acquisition Corp. d/b/a Flexible Flyer ("Flexible Flyer") files this Response in Opposition to Motion for Summary Judgment, and states the following:

**I.    STATEMENT OF FACTS**

In February, 2003, Flexible Flyer hired and Vialink Corp. ("Vialink") agreed to design, engineer and construct an entirely new go-kart that Flexible Flyer might ultimately sell to its largest customers, Sam's Club and/or Walmart. Ex. A, Godfrey at 51-52, 57, 96-98; Ex. B, Smith at 27-28, 70; Ex. C, Honsinger at 19-23; Ex. D, Garcia at 19, 20, 23; Ex. E, Laiche at 113-15; Ex. F, McFarlane (2008) at 8-12, Ex. G, Shankin at 38, 40, 47; Ex. H, Grove at 25-26, 43-44, 50. Flexible Flyer had previously dealt with Vialink on the design and production of a commercial utility vehicle (CUV), a relationship that began through the friendship of executives Richard Godfrey from Flexible Flyer and Steve Shankin at Vialink. Ex. A, Godfrey at 49, 97-98; Ex. G, Shankin at 33-37. Vialink advertised itself as a firm with expertise in industrial design, mechanical engineering and Asian outsourcing. Ex. M, McFarlane (2007) at 36-37; Ex. I, Company Profile.[1]

Through its design department, Vialink developed the concept of the Spiderbox go-kart which derived its name from its spider-webbed appearance. Ex. J, Concept Drawing. Upon

---

[1] Vialink still to this day utilizes a photograph of the Spiderbox go-kart as their icon of expertise in the fields of industrial design and mechanical engineering. Ex. I, Company Profile.

approval of this original concept, Vialink's employee, Bill Grove, designed and constructed the first Spiderbox go-kart from his shop in State College, Pennsylvania. Vialink and Mr. Grove had represented to Flexible Flyer that they were experts in double A-arm suspensions which had never been employed at Flexible Flyer on previous go-kart projects. Ex. K, Earrey at 89-90. Pursuant to the parties agreement, Vialink ultimately designed from scratch, built and delivered the first Spiderbox go-kart which was given to Flexible Flyer just before presentation to representatives at Walmart/Sam's Club. Ex. H, Grove at 50-51. Accompanying the Spiderbox go-kart were engineering drawings of the component parts prepared by Vialink. Ex. L, Vialink Engineering Drawings.[2] Contained within Vialink's double A-arm suspension design were the use of four ball joints that held the front-suspension and steering together. Ex. L, Vialink Engineering Drawings at Drawings 00023. After the meeting with Flexible Flyer in Bentonville, Arkansas, Sam's Club ultimately agreed to designate an SKU number for sale of the Spiderbox in its stores.

As part of the deal between Vialink and Flexible Flyer, Vialink also agreed to locate a satisfactory and reliable Asian source to forge the various parts for the Spiderbox. Ex. F, McFarlane (2008) at 12-13; Ex. G, Shankin at 57-58. Vialink chose Ching Tong Shan ("CTS") as its Asian source, and production of the go-kart parts began in August, 2003 from the engineering drawings prepared by Vialink. Ex. F, McFarlane (2008) at 25-26; Ex. E, Laiche at 50-51. Despite the relationship between CTS and Vialink, all purchase orders went directly to Vialink, all Spiderbox parts were invoiced directly from Vialink, and Flexible Flyer paid Vialink directly for all Spiderbox materials. Ex. G, Shankin at 63-65. Vialink was likewise the designated "Shipper" for all parts

---

[2] Mr. Grove utilized the name Designing Solutions///ELKco. on his drawings but was employed by Vialink when requested to and drafted the engineering drawings for the Spiderbox. Ex. H, Grove at 60-61.

2

directly from its Asian sources to West Point, Mississippi. Ex. N, Vialink Shipping Invoice. Finally, Vialink created point-of-purchase advertising material that was attached to each go-kart as it sat in the various retail outlets offering the product for sale. Ex. O, Advertising Materials.

After production had already begun, Flexible Flyer copied Vialink's engineering drawings into its own engineering software for the purpose of designating part numbers for customer service and creating owner's manuals. Ex. P, Plunk at 25; Ex. B, Smith at 40; Ex. D, Garcia at 91-92. For approximately a year, the double A-arm suspensions from Vialink came to Flexible Flyer pre-assembled with the ball joints therein, but the parts were eventually separated into smaller subassemblies after Flexible Flyer chose another vendor for the front spindle component. Ex. G, Shankin at 51, 139; Ex. E, Laiche at 73. The exact time period in which this change occurred is not clear from the record, but Vialink continued throughout the parties relationship to supply all ball joints since there was no indication of ball joint problems during the first year or more of production. Ex. M, McFarlane (2007) at 62.

In August, 2004, Flexible Flyer employed James Mast for the purpose of heading its engineering department. Ex. W, Mast at 5, 8 and 9. In late October, 2004, Mr. Mast first employed the "bump-dyno test" for go-karts which involved a roller track that allowed the go-kart to run in place while simultaneously having its suspension flexed up and down to simulate operation over rough terrain. While there were some ball joint failures in these tests, it was not learned until late February/early March, 2005 that the source of the failures was an alteration of the metallurgy in the ball joints, as opposed to random manufacturing defects or general design flaws within Vialink's A-arm suspension. Ex. W, Mast at 38. Flexible Flyer had employed Vista Engineering to analyze the chemical make-up of the ball joints which issued a written report on March 9, 2005, concluding that

the metallurgical content of the subject ball joints had been altered thereby significantly reducing their strength from the original supply. Ex. Q, Vista Engineering Reports. Vista Engineering was engaged from that time period forward until the bankruptcy of Flexible Flyer to continue monitoring the metallurgy of the ball joints being delivered by Vialink. Ex. Q, Vista Engineering Reports.

The fact that the metallurgical composition of the ball joints materially deviated from their original construction is not disputed in this case - it has been confirmed by Vialink's own expert witness. Ex. R, Jones at 55, 85-86. Like Vista Engineering, Mr. Jones testified that the metallurgical deviation from the original supply of ball joints resulted in a substantially weaker front-end on the Spiderbox. Ex. R, Jones at 40-42, 51. As revealed in the Vista Engineering reports, the problems with brittle ball joints is exacerbated when the actual temperature of the metal within the ball joint falls below certain levels. Ex. Q, Vista Engineering Reports.

Upon learning of the underlying cause of the ball joint failures, and even before Vista Engineering issued its written report, Flexible Flyer notified Vialink that it had pinpointed the problem and demanded replacement ball joints at no cost. Ex. G, Shankin at 77-84; Ex. D, Garcia at 77-79. As a result, production was halted in West Point, Mississippi for approximately one month, from March 4, 2005 to April 15, 2005, while Vialink coordinated the production and supply of new ball joints. Ex. D, Garcia at 90-92. Flexible Flyer also demanded that new material specifications be added to Vialink's original design so that it would not happen again. Ex. S, Flexible Flyer Drawing, March 2004. In April 2004, Vialink provided 20,000 replacement ball joints at no charge to begin retrofitting, repairing and producing new go-karts so that they would not contain the defective ball joints before production resumed. Ex. F, McFarlane (2008) at 58.

Although Vialink was notified of the problem and given the opportunity to cure, the information learned from Vista Engineering ultimately had to be shared with the Consumer Products Safety Commission (CPSC). Despite the notification to Vialink months earlier of the ball joint problem and the need for replacements, the CPSC subsequently required Flexible Flyer to employ a recall program to respond to and prevent additional consumer complaints that might arise. Ex. T, Recall Notice, June 21, 2005. The CPSC also notified Vialink about the recall. Ex. F, McFarlane at 58. In addition to damages incurred in complying with the recall, the ball joint problem resulted in the loss of sales, loss of customers and loss of future sales by Flexible Flyer as outlined by Charles Rafferty, in his accompanying expert report. Ex. U, Rafferty Report.

As will be demonstrated herein, there are issues of fact sufficient for this matter to proceed to trial on the issue of liability and damages to Flexible Flyer. As conceded by Vialink's designated accounting expert, there is no dispute that the ball joint recall resulted in monetary losses to Flexible Flyer even though it may have been suffering other financial problems at the time. Ex. V, Ross at 66-68. 75. There is also no dispute that the Vialink ball joints deviated from their original chemical composition some time after production had begun. As to the causes of action asserted in this case, there are multiple fact issues and inferences to be decide therefrom that will require resolution by the Court. Accordingly, summary judgment for Vialink should be denied and this matter should proceed to trial for resolution.

## II. LEGAL ANALYSIS

### A. FLEXIBLE FLYER DOES NOT CLAIM DAMAGE TO THE PRODUCT ITSELF.

Mississippi's products liability statute, Miss. Code. Ann. § 11-1-63, clearly provides for seller liability if a product "was defective because it deviated in a material way from the manufacturer's specifications or from otherwise identical units manufactured to the same manufacturing specifications . . ." There is no dispute in this case that the subject ball joints materially deviated from their original composition a year after production began. Ex. R, Jones at 55, 85-86; Ex. Q, Vista Engineering Reports. Accordingly, Vialink's motion only contests the type of damages recoverable by Flexible Flyer under the statute.[3]

Miss. Code. Ann. § 11-1-63 is applicable to "any action for damages caused by a product except for commercial damage to the product itself . . . ." The damages that will be asserted by Flexible Flyer at trial are set forth in Exhibit I to the Report of Charles Rafferty. These itemized damages are as follows:

Expenses Attendant With recall

| | |
|---|---:|
| JEZ Enterprises retro-fitting costs | $ 190,405 |
| Tellinfo, Inc. recall 1-800 service | 21,473 |
| Vista Engineering metallurgical laboratory | 17,666 |
| Materials Technology chemical analysis | 3,766 |
| Total Recall Expenses | 233,310 |

Cost of Returned Units

| | |
|---|---:|
| Returned units at retail | 425,936 |

---

[3] Other than the economic loss doctrine, Vialink does not raise any other basis for summary judgment under Miss. Code Ann. § 11-1-63 such that any further discussion or analysis of the individual elements under this statute is not warranted.

| | |
|---|---:|
| Academy Sports Offset | 100,598 |
| Expenses related to Sam's Club/WalMart Returns Post 2004 | 120,771 |
| Total Cost of Returned Units | 647,305 |
| Assets Subject to Valuation at 6/30/05 | |
|     Inventory | 8,528,000 |
|     Property, plant, and equipment | 205,000 |
|     Total Assets Subject to Valuation | 8,733,000 |
| Discounted Lost Profits | 8,391,464 |
| Gross Damages | 18,005,079 |
| Discounted Proceeds on Disposition of Assets | 3,129,141 |
| Net Damages | $ 14,875,938 |

The damages itemized above do not concern the product itself. Because Vialink supplied satisfactory replacement ball joints upon notice of its breach, reimbursement for the product itself is not the issue here. The damages claimed in this case instead concern the costs of the CPSC recall that began several months later, including the loss of sales and loss of customers for future go-kart sales following the recall. In this respect, the damages claimed in this matter concern property other than the ball joint or just go-karts with defective ball joints.

Flexible Flyer is aware that the economic loss doctrine precludes recovery of economic damages to the product itself simply as a matter of maintaining the distinction between tort and contract claims. The Mississippi Court of Appeals discussed the economic loss doctrine as a matter of first impression in *State Farm Mutual Automobile Insurance Co. v. Ford Motor Co.*, 736 So. 2d 384 (Miss. 1999). However, it did not consider damages like the ones alleged in this matter, such as loss of existing customers and future sales resulting from the product recall that followed

discovery of the defect. *See, e.g. Jiminez v. Superior Court*, 58 P.3d 450, 456 (Cal. 2003)(where defective windows caused damage to remainder of plaintiff's house, tort claim is not barred by economic loss doctrine); *Flex-o-Vit USA v. Niagara Mohawk Power Corp*, 292 A.D.2d 764 (N.Y. 2002)(economic loss doctrine did not preclude losses to other property caused by fire from defective product). In *State Farm Mutual Automobile Insurance Co.,* the economic loss doctrine was applied only where plaintiff claimed damage to an automobile as the result of a defective seal. 736 So. 2d at 387-88. Unlike the case at hand, the *State Farm* plaintiff had no additional claims for recalls, loss of sales and loss of customers as a result of the defective product.

Should the economic loss doctrine apply to some or all damage claims herein, a party is nevertheless permitted to proceed under breach of contract or any breach of warranty theories. *See e.g., East Miss. Electric Power Assn. v. Porcelain Products Co.*, 729 F. Supp. 512, 517-18 (S.D. Miss. 1990). Although Flexible Flyer does not waive and preserves for any appeal the opportunity to pursue its damage claims under Mississippi Products Liability Act, applicability of the economic loss doctrine does not prevent this matter from proceeding to trial under claims for breach of contract and breach of express and implied warranties.

> **B.   DISCOVERY HAS REVEALED THAT THE BALL JOINT ITSELF WAS DEFECTIVE INSTEAD OF ITS DESIGN**.

It is now undisputed in this case that the metallurgical composition of the subject ball joints were altered thereby compromising the strength of the double A-arm suspension designed and supplied by Vialink. Accordingly, there is no longer any claim for defective design in this cause of action and no need for resolution of whether expert testimony is required on the subject of design or whether this particular matter is within the realm of lay understanding.

### C. THERE IS NO NEED FOR ANALYZING THE ADEQUACY OF WARNINGS WHERE THE PRODUCT ITSELF WAS ADMITTEDLY DEFECTIVE.

Vialink has conceded through discovery that the change in metallurgical composition of the ball joint affected the integrity of the front ends designed and supplied to Flexible Flyer. Accordingly, there is no longer any claim for defective design in this cause of action and no need for resolution of whether expert testimony is required on the subject of inadequate warnings or whether this particular matter is within the realm of lay understanding.

### D. FLEXIBLE FLYER NOTIFIED VIALINK OF THE DEFECT AS SOON AS IDENTIFIED THROUGH METALLURGICAL TESTING.

Miss. Code Ann. 75-2-607(3) provides that "[w]here a tender has been accepted (a) the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy . . . ." "The adequacy and timeliness of notice under section 2-607 typically depend upon the reasonableness of the buyer's efforts to communicate his dissatisfaction." *T. J. Stevenson*, 629 F.2d at 359 n.41 (citing *United States v. Crawford*, 443 F.2d 611, 614(5th Cir. 1971)). "Where more than one inference may be drawn from undisputed facts, or the facts are disputed, the timeliness and sufficiency of a notice of breach ... are questions for the jury to resolve. The question of reasonableness must be determined from the circumstances of each individual case." *Id.* (quoting *Pritchard v. Liggett & Myers Tobacco Co.*, 295 F. 2d 292, 298 (3rd Cir. 1961)).

Vialink has freely admitted notification of Vista Engineering's discovery of metallurgical problems with the ball joints, even before Vista Engineering issued its preliminary March 9, 2005 report. Ex. G, Shankin at 77. There are further issues of fact as to whether notification was even sooner, perhaps in 2004. Ex. D, Garcia at 77-79. Regardless, following the precise identification

of the problem by Vista Engineering, Flexible Flyer informed Mr. Shankin, the owner and president of Vialink, that Vialink needed to correct the problem and steps were taken to provide replacement parts at no extra cost so that go-karts could be retrofitted. Ex. G, Shankin at 77-84. These particular demands obviously placed Vialink on notice that Flexible Flyer considered Vialink to be in breach with its prior supply of ball joints. Vialink obviously agreed there had been a breach as indicated by its replacing the defective ball joints at no cost to Flexible Flyer. The discussions and testing by Vista Engineering then continued, Vialink continued to receive new metallurgical reports and Vialink was informed that it would be hearing from the CPSC in the future regarding the correction of ball joints that had reached the consumer. Ex. G, Shankin at 84. Through these events, there are certainly issues of fact and/or conflicting inferences that may be drawn therefrom concerning the timeliness and sufficiency of notice.

The cases relied upon by Vialink primarily concern disputes over whether the buyer was obligated to pay for the disputed goods themselves. Miss. Code Ann. 75-2-607(2) provides that "Acceptance of goods by buyer precludes rejection of the goods accepted and . . . cannot be revoked . . . but acceptance does not of itself impair any other remedy provided by this chapter for nonconformity." *See e.g., Stimson Tractor Co. v. Heflin*, 516 S.W.2d 379, 382 (Ark. 1974)(acceptance of the goods does prohibit breach of warranty claims and consequential damages arising from later manifestation of defects); *Bonebrake v. Cox*, 499 F.2d 951, 957 (8th Cir. 1974)(initial acceptance of goods without notice of defect does not preclude subsequent breach of warranty claims although the timing of acceptance becomes a "mitigation of damages" issue for the trier of fact); *Marbelite Co. v. City of Philadelphia*; 222 A.2d 443 (Pa. Super. 1966)(although City deemed to have accepted goods and was liable for payment of goods, it was not prohibited from

10

claiming subsequent failure to function properly). There is no dispute in this case over acceptance or payment for the goods since Vialink already replaced the parts as it should, only for the consequential damages incurred after the source of the problem was actually identified.

Given Vialink's clear understanding in February/March, 2005 of the need to provide ball joint replacements and the warnings of future CPSC contact, its suggestion that it did not learn of a breach until the filing of the Counterclaim in the bankruptcy is absurd. Its 'replacement' conduct refutes any such allegation. As a result, the parties are left essentially arguing over a period of a couple of months in which Vialink claims it should have received earlier notice – November '04 v. February '05. While there is testimony that notice may have been sooner, the cases relied upon by Vialink concerning notice of a breach simply do not support summary judgment under these circumstances. *See e.g., Aqualon Co. v. Mac Equip. Co.*, 149 3d 262 (4th Cir. 1998)(notice not sufficient because three years had passed); *Lynx, Inc. v. Ordnance Products, Inc.*, 327 A.2d 502 (Md. 1974)(notice for first time years later in opposition to summary judgment motion for payment not sufficient). Not only do these fact seem to merely present issues concerning the mitigation of damages, the argument over these two months is insignificant where the damages itemized above flow from the June 21, 2005 recall, months after the undisputed notice to Vialink.

In *Eastern Airlines, Inc. v. McDonnell Douglas Corporation*, 532 F.2d 957, 972-75 (S.D. Fl. 1976), the Court concluded that the evidence created a factual dispute as to the adequacy and timeliness of notice given the parties prior relationship and the multitude of factual issues surrounding the complaints. Here, the parties were in a business relationship over a period of several years during which the increase in ball joint failures did not immediately stand out from past experience when the bump dyno testing first began in October/November/2004. *See* Ex. Q, Vista

Engineering Reports at 20 (noting fourteen (14) broken studs between October 31, 2003 and October 24, 2004 and fourteen (14) broken studs from October 27, 2004 to December 17, 2004). It was only *after* the number of broken ball joints began to exceed past experiences into January/February 2005 (the coldest winter months) did Flexible Flyer believe metallurgical testing from a laboratory might be prudent. Vialink has even testified there were no significant problems noted with the ball joints in December, 2004 and January, 2005, which brings the Court directly back to Vialink's admitted receipt of the Vista Engineering test results in February or March, 2005. Ex. M, McFarlane at 61-63.

In the case of *In re Belle-Moc, Inc.*, 182 F. Supp. 429, 437 (S.D. Maine 1960), the Court considered it significant to the issue of notice that the source of the defects could not be gleaned until extensive testing of the product was performed. Similarly here, the source of the ball joint failures that began to arise in the winter of late 2004/early 2005 could have just as easily been a flaw in the design of the entire front suspension, assembly of the various parts, or the effect of the new spindle from another vendor, until it was definitively learned otherwise. There could not have logically been notice of a "breach" until the problem was isolated. As testified to by Vialink's own engineering expert, he does not suggest Flexible Flyer should have maintained its own metallurgist on staff to discover latent defects Ex. R, Jones at 72. More importantly, Vialink was the entity specifically hired for its individual expertise in designing and outsourcing the majority of component parts of the Spiderbox upon which Flexible Flyer specifically relied. Ex. K, Earrey at 89-91; Ex. A, Godfrey at 51-52, 57, 96-98; Ex. B, Smith at 27-28, 70; Ex. C, Honsinger at 19-23; Ex. D, Garcia at 19, 20, 23; Ex. E, Laiche at 113-15; Ex. F, McFarlane (2008) at 8-12, Ex. G, Shankin at 38, 40, 47; Ex. H, Grove at 25-26, 43-44, 50. Vialink's own failure to test any of the parts despite its intimate involvement in the design, outsourcing and quality control for the Asian sources is an equally

important issue of fact for consideration of liability under these particular circumstances. Ex. M, McFarlane (2007) at 22-23; *see Wullschlieger & Co. v. Jenny Fashions, Inc.*, 618 F. Supp. 373, 375-76 (S.D.N.Y. 1985)(latent product defects were not discoverable upon receipt); *In re Rafter Seven Ranches, L.P.*, 546 F.3d 1194 (10th Cir. 2008)(reasonable time period of notice is tied to difficult in discovering nonconformity); *compare Inter Equip, Inc. v. Alloy Products Corp.*, 542 F. Supp. 238 (S.D. Texas 1982)(notice not reasonable since material deviation could have been gleaned from bill of lading). Because there was no indication from any of the invoices, purchase orders or bills of lading that the metallic composition of the subject ball joints had been altered, there are multiple issues of fact concerning the timing of notice in this case.

The cases respecting notice as an issue of fact for trial are equally as plentiful without the need for complete narration of their facts here. *See Mississippi Chemical Corp. v. Dresser-Rand Company*, 287 F.3d 359, 368 ( Miss. 2002)(holding that notice does not need to be in specific format or assertion of damages and affirming reasonable jury conclusion based on competing facts as to existence of notice); *Freeseen, Inc. v. Boart Longyear, Inc.*, 2008 WL 4534070 (C.D. Ill. 2008); *S. M. Wilson & Co. v. Reeves Red-E-Mix Concrete, Inc.*, 350 N.E.2d 321, 325 (Ill. App.1976)(contractor not deficient in discovering defect in concrete where chemical testing was required to identify the exact problem); *Babcock Poultry Farm, Inc. v. Shook*, 203 A.2d 399 (PA. Super. 1964) (issue concerning notice of breach properly left for jury resolution); *Page v. Camper City & Mobile Home Sales*, 297 So.2d 810, 812 (Ala. 1974)(notice of defect and resulting damage creates issue of fact for jury as to whether notice sufficient); *T. J. Stevenson & Co., Inc. v. 81,193 Bags of Flour*, 449 F. Supp 84, 128-29 (S.D. Ala. 1976)(issue of fact existed concerning adequacy of notice); *Overland Bond & Inv. Corp v. Howard*, 292 N.E.2d 168, 177 (Ill. App. 1972)(notice of

defects found sufficient where repairs were demanded of seller); *Boeing Airplane Co. v. O'Malley*, 329 F.2d 585, 596 (8th Cir.1964)(seller's participation in buyer's attempt to remedy situation was sufficient notice of breach); *Holiday Homes, Inc v. Bragg, Jr.*, 208 S.E.2d 608, 610 (Ga. App. 1974)(notice of deficiencies upon discovery sufficient notice for breach of warranty claims); *Waddell v. American Breeders Service, Inc*, 505 P. 2d 417, 421 (Mont. 1972)(notice does not require any certain form and normally creates issue of fact for jury resolution); *Wilson Trading Corp v. David Ferguson, LTD*, 244 N.E.2d 685, 689 (N.Y.1968)(manifestation of latent defects and subsequent notice of defect creates issue of fact as to reasonableness of notice).

Vialink's participation in the design, development, sourcing and quality control combined with its own lack of testing, the difficulty in identifying a latent problem through metallurgical testing, the conditions under which the problems began to manifest themselves during the winter months, the number of failures that began to arise before and after internal testing and/or the metallurgical testing that was ultimately performed, Vialink's receipt of notice of the test results even before the report was drafted, and perhaps even earlier, and the demands by Flexible Flyer that immediately followed merely create issues of fact proper for resolution by trial.

E. **THERE ARE ISSUES OF FACT CONCERNING BREACH OF CONTRACT AND BREACH OF EXPRESS AND IMPLIED WARRANTIES.**

Vialink incredibly represents throughout its motion that there was no contract between Vialink and Flexible Flyer. Obviously from the intricate business relationship existing between Flexible Flyer and Vialink as to the Spiderbox go-kart, there was an agreement between the parties. If not, why would Vialink design the go-kart, build the prototype, locate Asian sources, deliver the parts, invoice Flexible Flyer and accept payment. Since contracts may be oral or written, a more

accurate representation of the arrangement between these parties would be that the only written provisions of the contract between the parties concerning the Spiderbox are found within the stacks of invoices, shipping receipts, correspondence and payments for Vialink's product.

The testimony establishes that the agreement or contract between the parties was for Vialink to design, outsource and supply parts for an entirely new go-kart, the Spiderbox. Ex. K, Earrey at 89-91; Ex. A, Godfrey at 51-52, 57, 96-98; Ex. B, Smith at 27-28, 70; Ex. C, Honsinger at 19-23; Ex. D, Garcia at 19, 20, 23; Ex. E, Laiche at 113-22; Ex. F, McFarlane (2008) at 8-12, Ex. G, Shankin at 38, 40, 47; Ex. H, Grove at 25-26, 43-44, 50. Vialink specifically presented itself as the expert on all matters regarding the Spiderbox. Ex. I, Company Profile; Ex. M, McFarlane (2007) at 8-12, 36-37; Ex. K, Earrey at 89-91. While such an agreement would encompass the promise to create and sell a ball joint to Flexible Flyer that does not break apart during operation, such a claim here may be duplicative of warranty law. However, there is no requirement for dismissal of two valid alternative causes of action merely because each provides an avenue for recovery. Accordingly, Flexible Flyer does not waive its contract claims which are fully supported by the testimonies cited above as to the agreements and the course of dealings concerning production of the Spiderbox.

As to Flexible Flyer's cause of action for express warranty, Miss Code Ann. § 75-2-313 provides the following:

(1) Express warranties by the seller are created as follows:

    (a) *Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.*

> (b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.
>
> (c) *Any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model.*
>
> (2) *It is not necessary to the creation of an express warranty that the seller use formal words such as "warrant" or "guarantee" or that he have a specific intention to make a warranty*, but an affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty.

(emphasis added).

The supply and sale of ball joints for over a year that had an acceptable metallurgical composition could just as easily be construed under these factual circumstances to constitute an express warranty by Vialink to continue delivery of a similar quality ball joint without alteration. *See e.g. Rock Creek Ginger Ale Co., Inc. v. Thermice Corp*, 352 F. Supp 522, 527 (D.C.D.C.1971) (sales of product based on presentation of sample deemed to be express warranty that product would remain consistent with samples). Flexible Flyer had inspected, tested and approved the original ball joints before their delivery. Ex. E, Laiche at 57-60. It is undisputed that the deviation within the ball joints a year into production significantly reduced their strength and functionality and that the deviation was not Flexible Flyer's fault. Ex. Q, Vista Engineering Reports; Ex. R, Jones at 40-42, 51, 55, 85-86. Given that Vialink was specifically hired for its expertise concerning the Spiderbox, there are certainly issues of fact concerning whether the deviations from the original supply violated an express warranty under Miss Code Ann. § 75-2-313.

To recover for breach of the implied warranty of fitness for a particular purpose, the seller must only prove that (1) the seller at the time of the contracting had reason to know the particular

purpose for which the goods were required; (2) reliance by the plaintiff as buyer upon the skill or judgment of the seller to select suitable goods, and (3) that the goods were unfit for the particular purpose. *R. Clinton Const. Co. v. Bryant & Reaves, Inc.*, 442 F. Supp. 838, 845 (D.C. Miss. 1977)(judgment for cost of goods, cost of repairs and loss of income affirmed); *Ralston Purina Co. v. Howell*, 254 So. 2d 911 (Miss. 1971)(finding breach of implied warranty of fitness for particular purpose where purchaser relied upon knowledge and skill of seller). Here, the testimony is overwhelming as to Vialink's intimate involvement in the creation, design, engineering, outsourcing and supply of the majority of parts for the Spiderbox. Ex. J, Concept Drawing; Ex. L, Vialink Engineering Drawings; Ex. K, Earrey at 89-91; Ex. A, Godfrey at 51-52, 57, 96-98; Ex. B, Smith at 27-28, 70; Ex. C, Honsinger at 19-23; Ex. D, Garcia at 19, 20, 23; Ex. E, Laiche at 113-22; Ex. F, McFarlane (2008) at 8-12, Ex. G, Shankin at 38, 40, 47; Ex. H, Grove at 25-26, 43-44, 50. As to element one, Vialink's suggestion to the Court now that it had no knowledge of the purpose of the ball joints is simply absurd, and this absurdity goes not only to Vialink's responsibility herein, it also goes directly to Vialink's credibility, or lack thereof, in making such an argument. Flexible Flyer relied upon Vialink's expertise to build a new go-kart from the ground up - which it did. Ex. K, Earrey at 89-91. There is similar evidence from multiple witnesses and documents, including from Vialink's own expert witness, demonstrating that the subject ball joints were not of sufficient strength for incorporation into the Spiderbox. Ex. Q, Vista Engineering Reports; Ex. R, Jones at 40-42, 51, 55, 85-86. The reports of ball joint failures and the CPSC recall that followed also corroborate the conclusion that the subject ball joints were not fit for incorporation into the Spiderbox. While Flexible Flyer believes that summary judgment in its own favor on this cause of

action would be more appropriate, there are at least issues of fact concerning the claims for breach of this implied warranty sufficient to defeat the motion presently before the Court.

Flexible Flyer submits that the same facts discussed above and throughout this brief demonstrate issues of fact concerning the implied warranty of merchantability. There are five elements establishing a breach of the implied warranty of merchantability under Miss. Code Ann. § 75-2-314: (1) that a 'merchant' sold 'goods' and he was a merchant with respect to 'goods of the kind' involved in that transaction, (2) which were not merchantable at the time of sale, (3) injuries and damages to the plaintiff or his property, (4) caused proximately and in fact by the defective nature of the goods, and (5) notice to the seller of the injury. Vialink was certainly a merchant of goods of these type, there were damages caused by the ball joints and notice to Vialink as discussed above. While the evidence in this case does not warrant repeating again here, it certainly creates issues of fact concerning the merchantability of the subject ball joints sufficient to defeat the current summary judgment motion. *See e.g., Vince v. Broome*, 443 So. 2d 23, 26 (Miss. 1983) (reversed and remanded for trial on issue of breach of warranty of merchantability); *Hargett v. Midas Int'l Corp.*, 508 So. 2d 663, 665 (Miss. 1987)(same). Accordingly, the claims for breach of contract, breach of express warranty and breach of the implied warranties should proceed to trial.

### III.   CONCLUSION

Vialink was hired by agreement to design, engineer, outsource and supply parts for production of the Spiderbox go-kart. Vialink held itself out as an expert in these various subjects and Flexible Flyer relied upon Vialink's expertise to provide these services. Vialink invoiced Flexible Flyer and Flexible Flyer paid for the Spiderbox parts, including the ball joint at issue in this case. Vialink provided an acceptable ball joint for the Spiderbox for approximately one year before

the metallurgical content of the part changed which had a significant effect on the strength and functionality of the double A-arm suspension. Upon noticing an increase in front-end failures over and above past experiences, Flexible Flyer sent ball joints out for chemical and metallurgical testing to determine the possible causes of the front-end failures. Immediately upon isolation of a defect in the metallurgical composition of the ball joints, Vialink was notified of its breach and replacement parts were demanded along with the representation that the CPSC would be in contact regarding possible remedies for the consumer. As a result of the ball joint recall that followed, Flexible Flyer suffered expenses far beyond the cost of the product itself, including the costs of a recall, loss of customers and loss of future sales for which it is seeking reimbursement. Accordingly, there are issues of fact sufficient to proceed to trial on Flexible Flyer's Objection to Claim and Counterclaim.

WHEREFORE, Vialink Corp.'s Motion for Summary Judgment should be DENIED.

This the 15th day of April, 2009.

Respectfully submitted,
**FLEXIBLE FLYER LIQUIDATING TRUST F/K/A FF ACQUISITION CORP. D/B/A FLEXIBLE FLYER**

By: s/ Samuel L. Anderson
SAMUEL L. ANDERSON, ESQ.,
One of Its Attorneys

OF COUNSEL:
ARTHUR F. JERNIGAN (MSB #3092)
CRAIG M. GENO (MSB #4793)
SAMUEL L. ANDERSON (MSB #9785)
MELANIE T. VARDAMAN (MSB #100392)
HARRIS JERNIGAN & GENO, PLLC
587 Highland Colony Parkway
P. O. Box 3380
Ridgeland, MS 39158
Phone: (601) 427-0048
Fax: (601) 427-0050

**CERTIFICATE OF SERVICE**

I hereby certify that on April 15, 2009, I served a true and correct copy of the foregoing pleading via filing electronically with the Clerk of Court using the CM/ECF system which will send notification of such filing, or U. S. Mail, postage prepaid, to the following:

Eugene R. Naylor, Esq.
Jeremy Birdsall, Esq.
Wise Carter Child & Caraway, P.A.
Post Office Box 651
Jackson, Mississippi 39205
ern@wisecarter.com
jlb@wisecarter.com

D. Andrew Phillips, Esq.
Mitchell, McNutt & Sams, P.A.
Post Office Box 947
Oxford, Mississippi 38655-0947
aphillips@mitchellmcnutt.com

This the 15th day of April, 2009.

              s/ Samuel L. Anderson
              SAMUEL L. ANDERSON, ESQ.